No. 14330

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

THE STATE OF MONTANA ex rel.,
JAMES ZANDER,

       Relator,

   -vs-

THE DISTRICT COURT OF THE FOURTH JUDICIAL
DISTRICT OF THE STATE OF MONTANA, in and
for the County of Missoula, and the HONORABLE
JACK L. GREEN,

       Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

    For Relator:

        Robert J. Campbell argued, Missoula, Montana

    For Respondents:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Denny Moreen argued, Assistant Attorney General, Helena,
         Montana
        Robert L. Deschamps III, County Attorney, Missoula,
         Montana
        Ed McLean argued, Deputy County Attorney, Missoula, Montana

---

                Submitted: June 19, 1978

                   Decided: MAR 12 1979

Filed: MAR 12 1979

_Thomas J. Kearney_
                Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Relator James Zander has filed an original application for a writ of supervisory control in this Court seeking review and reversal of the District Court's denial of his motions to dismiss and suppress a pending criminal case against him.

On November 4, 1977, Zander's neighbor in the Juniper Trailer Court outside the city limits of Missoula, Montana reported to the sheriff's office that someone was tampering with the kitchen window in relator's trailer home. Deputy Hintz was advised there was a burglary in progress and was dispatched to the scene. Upon arrival Deputy Hintz went directly to the residence of the neighbor who had reported the incident. The neighbor told him there was no one at home at Zander's trailer home and that the trailer door was always kept locked.

Deputy Hintz observed a light over the kitchen sink in the Zander home, could not see anyone inside, noticed no signs of entry through the kitchen window, and saw no one nor anything suspicious outside the house.

He knocked at the door and received no response. He tested the door handle and found the door unlocked. He thought the reported prowler or burglar might be hiding in the house so he entered. He walked through the living room and the kitchen which appeared undisturbed. Deputy Crego, who had been dispatched to the scene as a backup man, entered the house moments after Deputy Hintz' entrance.

The officers then entered the back bedroom and saw a light shining under the closet door. They opened the door and discovered marijuana plants growing there under artificial light. Another closet disclosed the same scene.

The officers had no reason to believe there were any marijuana plants or drugs on the premises. They searched only

- 2 -

those areas of Zander's home where a prowler or burglar could have been hiding.

The officers left Zander's house, secured a search warrant, returned, and seized the marijuana plants, two coffee cans containing suspected marijuana plant material, and 2 one ounce plastic baggies of marijuana.

Zander was charged with the criminal sale of a dangerous drug by reason of the unlawful cultivation of marijuana. He moved to dismiss the charge and to suppress the evidence seized. The District Court of Missoula County denied all motions to dismiss and suppress.

Zander then applied to this Court for a writ of supervisory control to test the correctness of these rulings. We set the matter for adversary hearing and ordered briefs filed. In addition to the briefs of the parties, amicus briefs were filed by the American Civil Liberties Union and by the County Prosecutor's Services Bureau.

Five issues are presented in this matter:

(1) Is supervisory control an available remedy?

(2) Did the search violate the right of privacy provision in the State Constitution?

(3) Did the search violate the constitutional prohibition against unlawful searches and seizures?

(4) Does the statute under which defendant is being prosecuted violate the equal protection guarantee in the State Constitution?

(5) Does the statute under which defendant is being prosecuted violate the "due process" requirement of Montana's Constitution?

The State contends that supervisory control is not a proper remedy here because the District Court's rulings were neither arbitrary or unlawful and that an adequate remedy by

appeal is available in the event of relator's conviction.

The writ of supervisory control is not a common law or statutory writ. It is derived from Montana's constitutional provision granting this Court general supervisory control over all other courts. Article VII, Sec. 2(2), 1972 Montana Constitution. A similar provision existed in Montana's 1889 Constitution, Article VIII, Sec. 2. The writ has long been established as a part of this state's law and the discretionary use of this writ in original proceedings before this Court has a history of over 50 years.

The discretion to use this writ is determined by the needs of the individual case. Comparatively recently, it was used to test the constitutionality of the same statute here attacked at the close of the State's case-in-chief. State ex rel. LeMieux v. Dist. Court (1975), 166 Mont. 115, 531 P.2d 665, appeal dism., sub.nom. District Court of Fifth Judicial District of Montana v. Montana ex rel. LeMieux, 442 U.S. 1030, 95 S.Ct. 2647, 45 L Ed 2d 687. Because we wish to again examine the constitutionality of the statute, we exercise our discretion to do so by supervisory control prior to trial rather than limiting defendant to his remedy by appeal in the event of his conviction following trial.

We will discuss the second and third issues in this proceeding together. Defendant argues that the search and seizure here was unlawful for two reasons: (1) that it violated the "search and seizure" provisions of the United States and Montana Constitutions, and (2) that it violated the "right of privacy" provisions in the Montana Constitution.

Both the Federal and State Constitutions prohibit unreasonable searches and seizures. Fourth Amendment, U.S. Constitution; Article II, Sec. 11, 1972 Montana Constitution. Both permit searches and seizures under valid search warrants and

under certain circumstances without a search warrant. Here the focus of defendant's attack is not on the search warrant per se, but on the absence of probable cause in the first place to enter defendant's house without a warrant where the marijuana plants were discovered. He attacks both the warrantless entry into his house and the scope of the search in which the discovery was made that formed the basis for issuance of the search warrant.

We hold that the warrantless entry into Zander's house by deputies Hintz and Crego was proper and justified. A person had been observed under circumstances indicating an attempt at forced entry into the Zander home. Deputy Hintz found the front door unlocked after having been informed that nobody was home and that the door was always locked when the Zanders were away. The officers at the time of entry were engaged in protecting the Zander property. This included determining whether any burglars were hiding inside the house. A prudent officer was warranted in believing that a felony had been attempted or committed and in concluding that prompt entry into the home was necessary to protect the property and determine whether the suspect was hiding in the house. State v. Schrag (1975), 21 Or.App. 655, 536 P.2d 461; Henry v. United States (1959), 361 U.S. 98, 80 S.Ct. 168, 4 L Ed 2d 134; Draper v. United States (1959), 358 U.S. 307, 79 S.Ct. 329, 3 L Ed 2d 327.

As the officers' entry and search for the suspect was lawful, the incidental discovery of the contraband during the course of the search was likewise lawful under the "plain view" doctrine. Coolidge v. New Hampshire (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L Ed 2d 564. It is well settled that an object in plain view of an officer who lawfully is in a position to have that view is subject to seizure. Harris v. United States (1968), 390 U.S. 234, 88 S.Ct. 992, 19 L Ed 2d 1067. Montana has applied this principle and stated the rule in this language:

> "The rule is: Where there is prior justification
> for the police to search an area, and in search-
> ing the area, they inadvertently find incriminat-
> ing evidence which they had no reason to anticipate,
> they may lawfully seize that incriminating evidence."
> State v. Gallagher (1973), 162 Mont. 155, 167,
> 509 P.2d 852, 858.

Here the officers were not searching for drugs but for a suspected burglar. They had no reason to suspect the presence of contraband in the house. Their search was limited to places where the suspect might be hiding. The permissible scope of the search is as broad as is reasonably necessary to prevent the escape of the suspect from the house. Warden v. Hayden (1967), 387 U.S. 294, 87 S.Ct. 1642, 18 L Ed 2d 782. One of these possible hiding places was the closet where the contraband was discovered in plain view. Following its discovery, they secured a search warrant and seized the evidence. The officers conducted themselves in a laudable, exemplary and thoroughly lawful manner.

The second prong of defendant's argument that an unlawful search and seizure occurred is based on the "right of privacy" contained in the 1972 Montana Constitution. The gist of defendant's contention is that there was no compelling state interest justifying the invasion of a private home to criminalize the growing of a marijuana plant by an adult. Defendant cites the expert opinion evidence of Clarence C. Gordon, Professor of Botany at the University of Montana, and John P. Daniels M.D., a physician in Arlee, Montana to the effect that a marijuana plant constitutes no risk or hazard to health. Also cited is an affidavit of Dr. Thomas Ungerleider concerning recent studies of marijuana and why the present state of scientific knowledge has discredited its harmful effects. This affidavit was not presented to the District Court in this case but was taken from another District Court case in the ninth judicial district and first injected into this case in relator's brief to this Court.

- 6 -

We do not reach a determination of whether the cultivation or use of marijuana is or should be criminalized. This is patently a matter of state law to be determined by the legislature. The legislature has determined this by enactment of statutes making sale or possession of marijuana a criminal offense. Sections 54-132 and 54-133, R.C.M. 1947, now sections 45-9-101 and 45-9-102 MCA. This Court will not intrude on this legislative prerogative under the questionable theory that there is no evidence or policy basis for the statutes and that the legislature had no rational or reasonable basis for enacting them.

The remainder of Zander's contention is that there is no compelling state interest justifying intrusion into a private home to prevent an adult occupant from growing a marijuana plant, citing the "right of privacy" provision in Montana's Constitution.

Our Constitution provides:

"The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Art. II, Sec. 10, 1972 Montana Constitution.

We have no quarrel with this constitutional provision nor with the various authorities cited by relator and amicus American Civil Liberties Union for the pronouncement that a person has the valued and fundamental right to be let alone, free from governmental intrusion: Olmstead v. United States (1928), 277 U.S. 438, 48 S.Ct. 564, 72 L Ed 944; or that a man's home is his castle and the right of privacy there is a part of the constitutional guarantee of liberty and the pursuit of happiness. State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47; Welsh v. Pritchard (1952), 125 Mont. 517, 241 P.2d 816. We have also examined the other authorities cited by both parties and amici: Boyd v. United States (1886), 116 U.S. 616, 6 S.Ct. 524, 29 L Ed 746; State v. Sawyer (1977), ____Mont.____, 571 P.2d 1131, 34 St.Rep. 1441; Ravin v. State (1975), ____Alaska____, 537 P.2d 494; State v. Robey (1978), ____Mont.____, 577 P.2d 1226, 35 St.Rep. 541;

- 7 -

State v. Murphy (1977), 117 Ariz. 57, 570 P.2d 1070; and the other authorities cited in the briefs too numerous to mention here.

From these cases and our constitutional language certain principles of law emerge. The right of individual privacy is a fundamental constitutional right expressly recognized as essential to the well-being of our society. The constitutional guarantee of individual privacy is not absolute. It must be interpreted, construed and applied in the light of other constitutional guarantees and not in isolation. The right of individual privacy must yield to a compelling state interest. Such compelling state interest exists where the state enforces its criminal laws for the benefit and protection of other fundamental rights of its citizens.

The compelling state interest in this case lies in the protection of a citizen's home and its contents from unlawful intrusion. Relator's argument that the compelling state interest must be found in statutes prohibiting the cultivation and sale of marijuana is nonsense. The officers' intrusion here was purely and simply to protect the home and its contents including discovery and apprehension of the suspect. The purpose of the intrusion had nothing to do with enforcement of marijuana laws.

Protection of a person's property is an inalienable right guaranteed by our Constitution. Art. II, Sec. 3, 1972 Montana Constitution. This constitutional protection furnishes the compelling state interest to which the right of individual privacy must yield in this case.

Accordingly we hold that the District Court was correct in denying dismissal of the charge against defendant for violation of constitutional prohibitions against unreasonable searches and seizures and the right of privacy.

Zander next contends that the statute prohibiting the

- 8 -

cultivation of marijuana plants denies him equal protection of the laws under Art. II, Sec. 4 of the 1972 Montana Constitution. He argues that cultivation of tobacco is equally as harmful as cultivation of marijuana and that because no criminal sanctions are placed on tobacco cultivation while criminal statutes prohibit marijuana cultivation, he is denied equal protection of the laws.

Criminal statutes need not apply to all areas that may be injurious to public health and failure of the legislature to do so does not constitute denial of equal protection of the laws. Ravin v. State (1975), ___Alaska___, 537 P.2d 494. Determination or classification of the subjects of legislation does not deny equal protection. State v. Mitchell (1978), ____ Mo.____, 563 S.W.2d 18; State v. Kells (1977), 199 Neb. 374, 259 N.W. 2d 19. If all persons in the same class are treated alike, there is no violation of equal protection. Hart Refineries v. Harmon (1928), 81 Mont. 423, 263 P. 687, affd. 278 U.S. 499, 49 S.Ct. 188, 73 L.Ed. 475. Here there is but one class and all persons within that class are treated equally satisfying constitutional equal protection requirements.

Finally relator contends that section 54-132, R.C.M. 1947, now section 45-9-101 MCA, violates the due process guarantee in Montana's Constitution by creating an arbitrary presumption that cultivation of marijuana constitutes a sale of marijuana. The state responds that this issue was decided adversely to relator in State ex rel. LeMieux v. District Court (1975), 166 Mont. 115, 531 P.2d 665, appeal dismissed, sub.nom., District Court of Fifth Judicial District of Montana v. Montana ex rel. LeMieux, 442 U.S. 1030, 95 S.Ct. 2647, 45 L Ed 2d 687.

We agree that our holding in LeMieux ruled the statute in question constitutional against relator's attack here. However, we wish to re-examine our ruling in LeMieux prior to any

trial in this case and accordingly have granted review by supervisory control for that purpose.

LeMieux was a 3-2 decision reversing the ruling of the district judge that the statute was unconstitutional. Two members of the majority are no longer on the Court. The third member of the majority on the LeMieux court has expressed a desire to re-examine and review the LeMieux ruling. We proceed.

The statute in question provides in pertinent part:

"A person commits the offense of a criminal sale
of dangerous drugs if he . . . cultivates . . .
any dangerous drugs as defined in [this act]."
Sec. 54-132, R.C.M. 1947, now section 45-9-101 MCA.

Marijuana and marijuana plants are defined as dangerous drugs elsewhere in the Controlled Substances Act, sections 54-301 and 54-305, R.C.M. 1947, now sections 50-32-101 and 50-32-222 MCA. The majority held in LeMieux that the statute was constitutional because the legislature simply broadly defined "sale", did not create a presumption of "sale" from cultivation, and because the legislature could have prohibited the cultivation of marijuana by separate statute it did not overstep its power in including cultivation within the definition of "sale" in the act.

On re-examination it becomes clear that the legislature did create a conclusive and irrebuttable presumption of "sale" of marijuana from cultivation thereof. The language of the statute is clear and unambiguous. It plainly states that a person commits a criminal sale of marijuana if he cultivates it. The intention of the legislature must first be determined from the plain meaning of the words used and if the meaning of the statute can be so determined, the courts may not go further and apply any other means of interpretation. Dunphy v. Anaconda Company (1968), 151 Mont. 76, 438 P.2d 660; Haker v. Southwestern Ry. Co. (1978), ____Mont.____, 578 P.2d 724, 35 St.Rep. 523. When the language of the statute is plain, unambiguous, direct and

- 10 -

certain, the statute speaks for itself and there is nothing for the Court to construe. Dunphy v. Anaconda Company, supra; Jones v. Judge (1978), ____Mont.____ 577 P.2d 846, 35 St.Rep. 460. The function of the Court is simply to ascertain and declare what in terms or in substance is contained in the statute. Section 93-401-15, R.C.M. 1947, now section 1-2-101 MCA. Applying these rules we now hold that section 54-132, R.C.M. 1947, now section 45-9-101 MCA, creates a conclusive presumption of a criminal sale of marijuana from its cultivation.

The test of the constitutionality of such a statutory presumption has been determined by the United States Supreme Court:

> "Under our decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of one from proof of the other is arbitrary because of lack of connection between the two in common experience." Tot v. United States (1943), 319 U.S. 463, 467-468, 63 S.Ct. 1241, 1245, 87 L.Ed. 1519, 1524

A later U. S. Supreme Court decision further defined the test:

> "The upshot of Tot, Gainey and Romano is, we think, that a criminal statutory presumption must be regarded as 'irrational' or 'arbitrary', and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend." Leary v. U.S. (1969), 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L Ed 2d 57, 82.

We apply this test to the statute in question. We conclude that the fact proved (cultivation of marijuana) bears no rational connection with the fact presumed (sale of marijuana). Marijuana cultivators are not ipso facto marijuana sellers. Common experience indicates that many marijuana users cultivate the plant for their own use, particularly where, as here, small amounts are cultivated within the confines of one's closet. We cannot say with substantial assurance that such cultivating is

more likely than not to result in a sale. A conclusive statutory presumption that a marijuana cultivator is a marijuana seller is purely arbitrary. It precludes proof to the contrary. It offends the "due process" clause of our State Constitution. Art. II, Section 17, 1972 Montana Constitution.

Accordingly we hold that part of section 54-132, R.C.M. 1947, now section 45-9-101 MCA providing that a person commits a criminal sale of dangerous drugs if he cultivates marijuana is unconstitutional on its face. This ruling does not apply to nor affect section 54-133, R.C.M. 1947, now section 45-9-102 MCA, governing the offense of possession of marijuana.

Dismissal of the charge of a criminal sale of dangerous drugs against relator Zander in the District Court of Missoula County is granted.

_____
Chief Justice

_____

_____

_____
Justices

Mr. Justice Daniel J. Shea:

I concur with the majority opinion declaring section 54-132, R.C.M. 1947, to be unconstitutional in part, and will provide shortly my observations concerning the constitutionality of statutory presumptions in the field of the criminal law. I dissent from the majority on the right of privacy issue and a written explanation will be filed.

_____
Justice

- 12 -

# 14330

This is the dissent in State ex rel. Zander
v. Fourth Judicial District, no. 14330

FILED

APR - C

Thomas J. Kearney

CLERK OF SUPREME COURT
STATE OF MONTANA

# 14330

Mr. Justice Daniel J. Shea concurring in part and dissenting in part:

I concur with part of the Court's decision determining that the officers made a lawful entry into the defendant's home, and I concur with the Court's decision declaring a part of section 54-132, R.C.M. 1947, now section 45-9-101 MCA, invalid because it creates an impermissible conclusive presumption. I do have some observations on both of these points, however. I dissent to the Court's opinion declaring the officers did not violate the defendant's right of privacy by seizing the marijuana plants growing in his home.

There is nothing in the record to suggest that the officers had ulterior motives for the entry into the defendant's home. There is no evidence that they entered his home for any purpose other than to look for an intruder and to provide for the security of the home. Upon such a record I conclude that the initial entry was lawful. I believe however, that evidence concerning improper or ulterior motives could, in an appropriate case, compel an opposite conclusion. The courts must be careful that they do not allow a flimsy pretext to justify entry into the privacy of one's home.

The majority here has determined that section 54-132, R.C.M. 1947, now section 45-9-101 MCA, creates a conclusive presumption that offends the due process clause of the United States and Montana Constitutions. I agree. The Court cited Leary v. U.S. (1969), 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57, as embodying the proper rule to apply, or at least the rule to apply as far as the United States Constitution is concerned. There are several facts however, which I think should be made clear.

-13-

Leary v. U.S., supra, was a case where Congress enacted a statute which created a rebuttable presumption that possession of marijuana was done with knowledge that it was imported. The United States Supreme Court declared this rebuttable presumption to deny due process of law. Leary was a far cry from the situation here where the legislature did not just create a rebuttable presumption-- it created a conclusive presumption. This conclusive presumption could not be tolerated under any standard of due process of law which had "fundamental fairness" as one of its basic tenets.

It should also be emphasized that this Court has never laid down a definitive test for the constitutionality of a presumption under the due process clause of our own constitution. I do not read the majority opinion as adopting the Leary test as the test to be applied under our own constitution. Perhaps it remains for another day for us to make that determination.

Leary also stands as a warning that the legislatures of this land must be careful in adopting substantive crimes, and in creating presumptions, that the burden is not unconstitutionally shifted to the defendant. Indeed, Leary, in a footnote, indicates that the test may be more severe than the "substantial assurance" test quoted by the majority. The footnote stated:

> "Since we find that the #176a presumption is unconstitutional under this standard, we need not reach the question whether a criminal presumption which passes muster when so judged must also satisfy the criminal 'reasonable doubt' standard if proof of the crime charged or an essential element thereof depends upon its use. [Citing authority]." 395 U.S. at 36.

I turn next to my dissent on the "right of privacy" issue decided by the majority. Before venturing into legalistic arguments concerning the "right of privacy" in relation to marijuana, and the factual background concerning what is known about marijuana, I must confess that this society has been guilty of utter hypocrisy in its treatment of marijuana as opposed to other drugs which have been demonstrated to have far more appalling consequences to individuals and to the welfare of this society. The two drugs that stand out most in my mind are tobacco and alcohol. Nonetheless, we continue to bury our heads in the sand, deeper and deeper.

If there is a public health basis for criminalizing marijuana use, even in the home, there is a far more compelling basis in the interest of protecting society, and individuals from themselves, to criminalize the possession and use of alcohol and tobacco. This would of course, include possession and use in the home for purely personal, private purposes. (I emphasize however, that I do not recommend this course of action.) But assuming an unthinkable legislative act criminalizing alcohol and tobacco, it would not be within the realm of reasonable contemplation that even the most rabid prohibitionists and anti-smokers would sanction the invasion of the privacy of the home to seize alcohol and tobacco possessed by the occupants solely for their own personal, private use.

There is, I realize, an institutional prejudice in this area (that is, in those members comprising the various branches of government) which would assure that such laws would never come to pass. But assuming such laws to exist, the legislatures and courts of this country would never sanction the invasion of the privacy of the home to enforce

-15-

the law against possession and use of alcohol and tobacco.
There would be more than a little self interest to protect
because the use of these drugs is so pervasive in our
society. Regardless of the harm to society and individuals
from the use of alcohol and tobacco, I too believe it to
be unthinkable that we would ever tolerate the invasion
of the privacy of the home to eradicate the evils of
alcohol and tobacco. I believe the same "right of privacy"
considerations should extend to marijuana where it is
possessed and used in the privacy of the home, for private,
personal use. "Public" health does not demand that the
home be invaded under these circumstances.

The thrust of defendant's approach in the District
Court and in this Court was that marijuana plants, while
in the process of growing, and thus not in usable form to
be ingested, were dangerous to no one. Accordingly, there
could be no "compelling state interest" under the privacy
provision of our constitution to seize the plants and
prosecute one for growing the plants. Whoever was growing
the plants however, can hardly be said to have been expressing
just a normal American's curiosity as to how marijuana
plants fared while growing under artificial lighting in
the closet of a home. It is doubtful that this was the
extent of the possessor's interest in the plants; rather,
it is not unreasonable to assume that the active ingredients
of the plants were at a later time, intended for human
ingestion. I note moreover, that the State adopted an
equally simplistic legal approach to the problem of whether
the marijuana plants should have been seized.

The State presented no evidence in the trial court
as to the harmful effects of marijuana, but instead relied

-16-

exclusively on a legislative act criminalizing marijuana. Based on this act of criminalization, the State contended it had the right to use the entire criminal law enforcement arsenal at its disposal, including of course, the right to invade the privacy of a home. During the hearings on the defendant's motions, the prosecutor argued to the trial court:

"Your Honor, I believe the legislative acts have a presumption of validity, and operating under that presumption on November 5, 1977 law enforcement officials of Missoula, Montana prepared and submitted the Justice of the Peace Bill Monger an application for a search warrant. Evidently Judge Monger agreed with the law enforcement officers and issued a search warrant in accordance with the applicable statutes. Your Honor, I do not believe that when we find a person in violation of Montana law that we have to go up and show a compelling state interest in each and every criminal statute that has been deliberated and decided by the legislature, and has already been before the Supreme Court on several occasions."

By this analysis, the State would have the courts equate a legislative enactment with a "compelling state interest" to override the protection guaranteed by the "right of privacy" provision of our constitution. This interpretation would mean that the legislature could in- directly determine the confines of the constitutional "right of privacy" by merely enacting a law declaring an act or omission to be a crime. This would effectively destroy the power of the courts to interpret the meaning of the constitution. The legislature can, of course, recognize the rights of privacy through legislation, but it cannot restrict the right of privacy to any lesser extent than this Court is willing to recognize under its con- stitutional duty to interpret the constitution.

Notwithstanding the State's failure to meet the fundamental and underlying issue raised by the seizure of

-17-

marijuana in the privacy of one's home, it appears that the majority has come dangerously close to adopting the State's position. In one breath the majority adopts with approval the various definitions and meanings of the right of privacy which have evolved over the years. But in the next breath, the majority misapplies these same principles. The majority first stated:

> "We have no quarrel with this constitutional provision nor with the various authorities cited by the relator and amicus American Civil Liberties Union for the pronouncement that a person has the valued and fundamental right to be left alone, free from governmental intrusion. [Citing authority]; or that a man's home is his castle and the right of privacy there is a part of the constitutional guarantee of liberty and the pursuit of happiness [Citing cases]. We have also examined the other authorities cited by both parties and amici [Citing cases] and the other authorities cited in the briefs too numerous to mention here."

Unfortunately, the majority failed to analyze these cases before coming to its conclusion as to their meaning and application to this case. The majority again stated:

> "From these cases and our constitutional language certain principles of law emerge. The right of individual privacy is a fundamental constitutional right expressly recognized as essential to the well-being of our society. The constitutional guarantee of individual privacy is not absolute. It must be interpreted, construed and applied in the light of other constitutional guarantees and not in isolation. The right of individual privacy must yield to a compelling state interest. Such compelling state interest exists where the state enforces its criminal laws for the benefit of and protection of other fundamental rights of its citizens.

> "The compelling state interest in this case lies in the protection of a citizen's home and contents from unlawful intrusion. Relator's argument that the compelling state interest must be found in statutes prohibiting the cultivation and sale of marijuana is nonsense. The officers' intrusion here was purely and simply to protect the home and its contents including discovery and apprehension of the suspect. The purpose of the intrusion had nothing to do with enforcement of the marijuana laws.

-18-

"Protection of a person's property is an
inalienable right guaranteed by our Constitution.
Art. II, Sec. 33, 1972 Montana Constitution.
This constitutional protection furnishes the
compelling state interest to which the right
of individual privacy must yield in this case.

"Accordingly we hold that the District Court
was correct in denying dismissal of the charge
against defendant for violation of constitutional
prohibitions against unreasonable searches and
seizures and the right of privacy." (Emphasis
added.)

Before discussing the basis of the majority's opinion
on the "right of privacy", I must state that it appears the
majority has left for another day the determination of
whether the right of privacy provision in the Montana
Constitution is violated by a seizure of marijuana in one's
home where there is no evidence that it was intended for
other than private, personal use, and where the initial
purpose for entry into the home was to seize the marijuana.
I say this because the majority has focused its attention
on the lawful entry of the police officers into the home
where the purpose for the initial entry was to look for
an intruder and to protect the defendant's property, and
not for the seizure of the growing marijuana plants. But
even the majority rationale leaves something to be desired.

It is true that upon the initial entry into defendant's
home the officers were there to look for an intruder and
at least ostensibly, to protect the defendant's property.
It was after their entry into the home that they discovered
the growing marijuana plants in the closet. But the officers
did not then seize the marijuana plants. Rather, based on
this evidence in "plain view" (once they had opened the
closet doors) the officers left the home, applied for and
obtained a search warrant, and then returned to defendant's
home, entered, and seized the marijuana plants. Clearly,

-19-

the only motive for reentry into the home was to seize the marijuana plants, and perhaps to conduct an additional search for drugs. In any event, they seized only the growing marijuana plants. I believe that this reentry triggered the "right of privacy" provision of our constitution. I emphasize however, that I do not base the foundation of my dissent upon this reentry distinction. Whatever the case, it appears to me that the majority has not foreclosed a "right of privacy" contention where the _initial_ purpose for going into the home was to seize marijuana being possessed only for private, personal use.

As to the basis of the majority opinion I must admit I am more than a little perplexed. First, the majority states that the State has a right to enforce its criminal laws, and possession of marijuana is a crime. The logical implication of this statement, although not expressly stated, is the State also has the right to use its enforcement tools of search and seizure to enter a private home to seize marijuana. Second, the Court holds that the State has a right to assert a constitutional right belonging to the defendant, and therefore, under appropriate circumstances, enter his home to protect his property. Once inside, however, the State is free to observe what there is to observe, and if there is evidence of criminal activities, it may either seize the evidence then, or, as in this case, leave, obtain a search warrant, reenter the house, and seize the evidence.

The constitutional provision (1972 Mont. Const., Art. II, §3), cited but not quoted by the majority for the principle that the police may assert defendant's constitutional rights to protect his property provides as follows:

-20-

"All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities." (Emphasis added.)

Presumably, the Court is referring to the defendant's inalienable right of "acquiring, possessing and protecting property . . ." But the irony here is that defendant at no time asserted his right to the protection of his property from anyone or any source. Indeed, if he knew that was to be the approach of this Court in granting him his constitutional rights, I am sure he would gladly have waived that right. It would appear, moreover, to be a constitutional innovation of the highest magnitude that the police can assert a constitutional right that belongs to the defendant, and on that basis acquire evidence against him that he was growing marijuana plants in his home. I can only hope the majority does not really mean what was stated in their opinion. If so, this would be one of the most dangerous precedents ever enunciated by an appellate court.

Notwithstanding these flaws, the real failure is that the majority has refused to come to grips with the fundamental problem surrounding the criminalization and use of marijuana in relation to the police procedures used to eradicate this problem from our society. In doing so, the majority ignores the realities of life and continues to perpetuate a fundamental hypocrisy in our society.

As I mentioned earlier, the majority position does not consider that the marijuana plants were seized upon the reentry to the home when the only motive for the entry was to seize the plants. But neither does the opinion consider

-21-

a balancing of the basic interests involved in a determination of the right of privacy to possess marijuana in one's own home, for private, personal use. Under the facts of this case, I see no compelling State interest to be served by the seizure of the marijuana plants. If, at the time they applied for the search warrant, the officers had evidence and provided it to the magistrate, that the marijuana was being used for other than personal use, perhaps I would not reach the same conclusion.

Essential to a determination of this issue is whether the privacy clause of our constitution, may, under certain circumstances, or where certain types of crimes are involved, impose additional limitations on the general requirements of probable cause to search for and seize evidence in the privacy of one's home. If strict search and seizure concepts are applied without regard to the constitutional "right of privacy", the seizure here was lawful. Indeed, applying strict search and seizure concepts that issue was foreclosed once this Court determined that the initial entry into the home was lawful. But the "right of privacy" issue was not foreclosed. The right to enter a private home to search for evidence of a murder cannot, for example, be equated with the entry into a private home to search for evidence that one is possessing marijuana for his personal use. Nor could it be equated with the entry of a home to obtain evidence of the possession of alcohol or tobacco used for personal use assuming the criminalization of these acts.

The right of privacy provision of our constitution, 1972 Mont. Const. Art. II, §10, provides as follows:

> individual
> "The right of/privacy is essential to the
> well being of a free society and shall not
> be infringed without the showing of a
> compelling state interest."

-22-

The search and seizure protections given to the residents
of this State by 1972 Mont. Const. Art. II, §11, provide
as follows:

> "The people shall be secure in their persons,
> papers, homes and effects from unreasonable
> searches and seizures.  No warrant to search
> any place, or seize any person or thing
> shall be issued without describing the place
> to be searched or the person or thing to be
> seized, or without probable cause, supported
> by oath or affirmation reduced to writing."

The "right of privacy" belongs to all Montana residents.
In areas where the right attaches, it can be overcome only
by proof of a "compelling state interest."  The search and
seizure provision is likewise not a grant of power to the
State.  Rather, it is a recognition of rights which inhere
in all Montana residents.  This section restricts the power
of the State to either search any place or arrest any person.
It is consistent to conclude that these rights may, in
certain circumstances, complement or supplement each other
rather than be antagonistic to each other.  In many situations
the legitimate interests of the State will override any
consideration of individual privacy.  On the other hand, in
many situations the demands of privacy will override any
claim of the State to intrude on that privacy.  In search
and seizure situations this may well impose an additional
burden upon the State before property may be lawfully seized
by intrusion into the privacy of one's home.

The majority is correct in stating that the constitutional
provisions involved must be "construed and applied in the
light of other constitutional guarantees and not in isolation."
But I believe that the "right of privacy" provision of our
constitution is a more natural partner with the search and
seizure provision in our constitution, that the "right of
privacy" provision is with the right of the defendant to

protect his property, especially since the majority has so graciously allowed the police to assert defendant's constitutional right to protect his property.

The "right of privacy" and search and seizure prohibitions and limitations are meant to protect the individual, not the State. It cannot be stated as an immutable principle that the existence of probable cause to search for or seize evidence, automatically converts into a compelling state interest that overcomes any claim to a right of privacy. This appears to be the holding of the Arizona Supreme Court in the case of State v. Murphy (1977), 17 Ariz. 57, 570 P.2d 1070. There the court determined that the right of the legislature to make marijuana possession illegal automatically precluded any reliance by the defendant on the right of privacy provision of the Arizona Constitution. While not expressly so holding, it appears that the decision of this Court comes dangerously close to the same holding. This simplistic approach gives no meaning at all to the "right of privacy."

It is a dangerous precedent to hold that the existence of a criminal law automatically converts into a "compelling state interest" which overcomes any claim to a "right of privacy." The effect of it is to let the legislature define and limit the application of the "right of privacy." All the legislature need do to erode the right of privacy is to enact a criminal statute declaring a certain act or omission to be criminal, and by that very act a person is forever foreclosed from asserting a "right of privacy" claim as a result of an attempt to enforce that law. This is judicial abdication at its worst.

-24-

Where a right of privacy is claimed which arises out of conduct taking place within/a person's home, it is proper to look at the nature of the alleged crime before a determination can be made as to whether the state could lawfully enter the home to obtain evidence of that crime. Implicit in this approach is the question of whether all criminal laws can be constitutionally enforced with the same vigor and with the same law enforcement arsenal at the State's disposal, where the activity which is taking place is in the privacy of a home. In certain kinds of cases probable cause to search or seize evidence possessed in the privacy of one's home may well be subject to an additional requirement that one's right of privacy should be given more protection than the right of the State to invade the home in order to search for or seize the evidence. On the other hand, the right of privacy provision should not be so interpreted so as to strip the State in all cases of its traditional methods of gathering evidence of crime, which includes the search for and seizure of evidence inside the privacy of one's home. As in all cases, a balance must be struck between the rights of the individual and the rights of the State. Where there is doubt however, the balance must be struck in favor of the individual. Clearly, when the evidence as to the alleged harmfulness of marijuana is considered in conjunction with the fundamental protection given to the home as a place historically honored as giving rise to the right of privacy, the State cannot prove a compelling State interest.

It is necessary to consider the location of the person at the time which gives rise to the claimed right of privacy, and the kind of activity engaged in which is claimed

-25-

to be protected by the right of privacy. Needless to say, neither of these are absolutes. There is a slightly different twist to this case because the defendant was not physically in his home at the time the officers entered and discovered the marijuana or at the time they returned and seized the marijuana pursuant to a search warrant. But the right of privacy would be a hollow right indeed if one could assert this right only if he was actually at home at the time of the intrusion.

In the context of this case, the question is whether there was a compelling state interest for the State to use its powers of search and seizure to invade the privacy of defendant's home to seize marijuana, where there was no preexisting evidence that it was being possessed in the home for other than personal, private use.

Few in this State or for that matter, in this country would deny that if there is any place where a right of privacy should have recognition it is in one's home. It is the traditional refuge and sanctuary of a democratic society. Needless to say, the individual dignity of each person, together with a recognition that there must be a place allowing each person "to be", was one of the impelling reasons for imposing constitutional limitations in the federal and state constitutions on the right of the government to search for and seize evidence. This Court has recognized the longstanding common law recognition of the sanctuary of the home. In Welsh v. Roehm (1952), 125 Mont. 517, 523, 241 P.2d 816, this Court stated:

> "The common law has always recognized a
> man's house as his castle, impregnable,
> often, even to its own officers engaged
> in the execution of its commands."

-26-

In State v. Brecht (1971), 157 Mont. 264, 270, 485 P.2d 47, this Court quoted this language in Welsh, and also expressed some idea of what interest inside the home was meant to be protected:

> "'. . . The "right of privacy" is embraced within the absolute rights of personal security and personal liberty . . .
>
> "The basis of the "right of privacy" is the "right to be let alone" and it is "a part of the right of liberty and pursuits of happiness."'" (Emphasis added.)

And of course, 1972 Mont. Const. Art. II, §3, relied on by the majority for another principle (misapplied) and previously quoted in this dissent, gives some indication of the scope of personal freedom intended.

In the recent case of Luciano v. Ren and State of Montana (1979), _____ Mont. _____, 589 P.2d 1005, 36 St.Rep. 179, (in a case not involving a claim of right of privacy), we quoted with approval from Union Pac. R. Co. v. Botsford (1891), 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734:

> "No right is held more sacred, or is more carefully guarded, by common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

One of the earliest statements of the substantive content of the right of privacy (as opposed to the location where that right is enjoyed) is contained in a dissenting opinion by Justice Brandeis, in the case of Olmstead v. United States (1928), 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, where he said:

> ". . . The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfaction of life are to be found in material things.

-27-

> They sought to protect Americans in
> their beliefs, their thoughts, their
> emotions and their sensations. They
> conferred, as against the government,
> the right to be let alone--the most
> comprehensive of rights and the right
> most valued by civilized man." 277 U.S.
> at 478. (Emphasis added.)

The majority opinion in the instant case seemingly cited this statement in Olmstead with approval.

The language of this dissent was incorporated into a majority opinion in the case of Stanley v. Georgia (1969), 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542, where the Supreme Court held that "the mere private possession of obscene matter cannot constitutionally be made a crime." 394 U.S. at 559. The court further stated in Stanley:

> ". . . Georgia asserts that exposure to
> obscene materials may lead to deviant
> sexual behavior or crimes of sexual
> violence. There appears to be little
> empirical basis for that assertion . . .
> Given the present state of knowledge,
> the State may no more prohibit mere
> possession of obscene matter on the
> ground that it may lead to antisocial
> conduct than it may prohibit possession
> of chemistry books on the ground that
> they may lead to the manufacture of homemade
> spirits." 394 U.S. at 566-67. (Emphasis
> added.)

The right to possess marijuana can hardly be placed on the same scale as our first amendment rights. Nonetheless, from Stanley there are important lessons to be learned, particularly if the constitutional "right of privacy" in our State is to be given any substantive effect.

A private act occurring within the privacy of the home may be constitutionally protected; but if the same activity becomes public it may be the subject of a criminal prosecution. For example, defendant in Stanley was convicted under a Georgia statute which criminalized the mere private possession of obscene material; however, the United States Supreme Court held that the State did not have the right to criminalize

-28-

the "private possession of obscene matter." On the other hand, if Stanley had been running a commercial operation, presumably in or out of the home, the State could constitutionally criminalize such conduct.

Just as important, the Court looked behind the statute criminalizing private possession of obscene material and did not accept the State's bald "assertion that exposure to obscene materials may lead to deviant sexual behavior or crimes of sexual violence." The Court concluded that there was "little empirical basis" for this emotional rhetoric. The Court emphasized that "given the present state of knowledge . . ." of the effects of possessing these materials, Stanley's conduct within the home could not be criminalized.

The Stanley rationale is plainly analogous to the criminalization of adult possession of marijuana, within the home, for private, personal use. Given the explicit "right of privacy" protection guaranteed by our own constitution, the State is required to show an "empirical basis" founded on the "present state of knowledge" that the "public" health would be affected, before a "compelling state interest" would be shown. The facts ("present state of knowledge") as to use of marijuana are such that the State cannot meet the "compelling state interest" requirement of our constitution to justify invasion of the home.

The Alaska Supreme Court in Ravin v. Alaska (Alaska 1975), 537 P.2d 494, in interpreting its own right to privacy provision in the state constitution, held that the legislature could not constitutionally criminalize possession of marijuana possessed in the privacy of the home for personal, private use. The home as a prime center for

-29-

the existence of a right of privacy, together with a record barren of any "public" health dangers posed by the use of marijuana, impelled the Court to tip the scales in favor of the individual.

What the Ravin court said on the question of the home in relation to the right of privacy, is equally applicable to the situation here. The court first discussed the impact of decisions of the United States Supreme Court where the privacy of the home was a substantial factor:

> ". . . Thus, Ravin's right to privacy
> contentions are not susceptible to
> disposition solely in terms of answering
> the question whether there is a general
> fundamental constitutional right to possess or
> smoke marijuana. This leads us to a more detailed
> examination of the right to privacy and
> the relevancy of where the right is exercised.
> At one end of the scale of the scope of the
> right to privacy is possession or ingestion
> in the individual's home. If there is any
> area of human activity to which a right
> to privacy pertains more than any other,
> it is the home. The importance of the home
> has been amply demonstrated in constitutional
> law. Among the enumerated rights in the
> federal Bill of Rights are the guarantee against
> quartering of troops in a private house in
> peacetime (Third Amendment) and the right to
> be 'secure in their . . . houses . . . against
> unreasonable searches and seizures . . .' (Fourth
> Amendment). The First Amendment has been held
> to protect the right to 'privacy and freedom of
> association in the home' [citing Moreno v. United
> States Dep't. of Agriculture, 345 F.Supp. 310,
> 314 (D.C.C. 1972) Aff'd 415 U.S. 528, 93 S.Ct.
> 2821, 37 L.Ed.2d 782 (1973)]. The Fifth Amendment
> has been described as providing protection against
> all government invasions 'of the sanctity of a man's
> home and the privacies of life.' [Boyd v. U.S.,
> 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746, 751
> (1886)]. The protection of the right to receive
> birth control information in Griswold was predicated
> on the sanctity of the marriage relationship
> and the harm to this fundamental area of privacy
> if police were allowed to 'search the sacred precincts
> of marital bedrooms.' [381 U.S. at 486, 85 S.Ct.
> at 1682, 14 L.Ed.2d at 516]. And in Stanley v.
> Georgia, the Court emphasized the home as the
> situs of protected 'private activities.' [394 U.S.
> at 564, 89 S.Ct. at 1247, 22 L.Ed.2d at 549]. The
> right to receive information and ideas was found
> in Stanley to take on an added dimension precisely

because it was a prosecution for possession in the home: 'For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.' [394 U.S. at 564, 89 S.Ct. at 1247, 22 L.Ed.2d at 549]. In a later case, the Supreme Court noted that Stanley was not based on the notion that the obscene matter was itself protected by a constitutional penumbra of privacy, but rather was a 'reaffirmation that 'a man's home is his castle.'" [Paris Adult Theatre I v. Slaton (1973), 413 U.S. 49, 66, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446, 462.]. At the same time the Court noted, 'the Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education.' [U.S. v. Orito (1973), 413 U.S. 139, 142, 93 S.Ct. 2674, 2677, 37 L.Ed.2d 513, 517]. And as the Supreme Court pointed out, there exists a 'myriad' of activities which may be lawfully conducted within the privacy and confines of the home, but may be prohibited in public. [U.S. v. Orito (1973), 413 U.S. 139, 142-143, 93 S.Ct. 2674, 37 L.Ed.2d 513, 518]". Ravin, 537 P.2d at 502-03. (Emphasis added.)

But the Alaska Supreme Court did not rest solely on those cases decided by the United States Supreme Court which focused to a large extent on the sanctity and privacy of the home. The Court also stated with regard to its own laws:

"In Alaska we have also recognized the distinctive nature of the home as a place where the individual's privacy receives special protection. This court has consistently recognized that the home is constitutionally protected from unreasonable searches and seizures, reasoning that the home itself retains a protected status under the Fourth Amendment and Alaska's constitution distinct from that of the occupant's person. The privacy amendment to the Alaska Constitution was intended to give recognition and protection to the home. Such a reading is consonant with the character of life in Alaska. Our territory and now state has traditionally been the home of people who prize their individuality and who have chosen to settle or to continue living here in order to achieve a measure of control over their own lifestyles which is not virtually unattainable in many of our sister states."

-31-

> "The home, then, carries with it associations
> and meanings which make it particularly
> important as the situs of privacy.  Privacy
> in the home is a fundamental right, under both
> the federal and Alaska constitutions . . ."
> 537 P.2d at 503-504.

We can say no less about the laws of our own State. The "right of privacy" provision in our own constitution which can be overcome only by a "compelling state interest", is one of the strongest in the nation.  No one would doubt that the greatest protection under this right should be in the privacy of the home.  Our former and present constitutional provisions against unreasonable searches and seizures has particular application to the home.  The decisions of this Court, supra, have long recognized the special status of the home.  The examples are too many to set forth situations where legislative enactments of this State attach special significance and protection for the home.  And the statement of the United States Supreme Court in U.S. v. Orito (1973), 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513, has particular relevance to the laws of this State which have already been enacted:

> ". . . It is hardly necessary to catalog
> the myriad activities that may be lawfully
> conducted within the privacy and confines
> of the home, but may be prohibited in
> public. . ."  413 U.S. at 142-43, 93 S.Ct.
> 2674, 37 L.Ed.2d at 518.

It is these considerations of privacy that influenced the court in Ravin to look closely into the evidentiary justification for the criminalization of marijuana where it is possessed in a "purely personal, non-commercial context in the home . . ."  537 P.2d at 504.  The Court adopted a standard by which the evidence is to be judged where it is possessed in the privacy of the home:

> ". . . We do not mean by this that a person
> may do anything at anytime as long as the
> activity takes place within a person's home.

There are two important limitations on this facet of the right to privacy. First, we agree with the Supreme Court of the United States, which has strictly limited the Stanley guarantee to possession for purely private, noncommercial use in the home. And secondly, we think this right must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it is private. That is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated.

"Thus we conclude that citizens of the State of Alaska have a basic right to privacy in their homes under Alaska's constitution. This right to privacy would encompass the possession and ingestion of substances such as marijuana in a purely personal, non-commercial context in the home unless the state can meet its substantial burden and show that proscription of possession of marijuana in the home is supportable by achievement of a legitimate state interest." 537 P.2d at 504. (Emphasis added.)

The Court then set forth what the scope of its inquiry should be as regards the possession of marijuana in the home for personal, private use:

"This leads us to the second facet of our inquiry, namely, whether the State has demonstrated sufficient justification for the prohibition of possession of marijuana in general in the interest of public welfare; and further, whether the State has met the greater burden of showing a close and substantial relationship between the public welfare and control of ingestion or possession of marijuana in the home for personal use." 537 P.2d at 504.

The Ravin court relied extensively, though not exclusively, on the report to Congress of the National Commission on Marijuana, submitted in 1972. The Commission was chaired by former Pennsylvania Governor Raymond R. Shafer,

-33-

and was also composed of four medical doctors, two congressman and two senators. The report was entitled: Marijuana: A Signal of Misunderstanding, /the First Report of The National Commission on Marijuana and Drug Abuse, March 1972.

The Ravin court did not ignore the evidence and conclusions presented to the United States Congress, and neither should this Court ignore this evidence.

The Commission reported to Congress on the question of medical and health data, possible progress to the use of hard drugs because of the use of marijuana, the danger to public safety because of the use of marijuana, and in general, concerning the public policy considerations in using the criminal law to the fullest extent in enforcing the laws against the possession of marijuana. I set forth some of the essential findings and conclusions.

The Commission stated in relation to medical and health data:

> ". . .[T]he most notable statement that can be made about the vast majority of marijuana users--experimenters and intermittent users--is that they are essentially indistinguishable from their non-marijuana using peers by any fundamental criterion other than their marijuana use." (p. 41.)

> ". . . [F]rom what is now known about the effects of marijuana, its use at the present level does not constitute a major threat to public health." (p. 90.)

> ". . .[N]o conclusive evidence of any physical damage, disturbances of bodily processes or proven human fatalities attributable solely to even very high doses of marijuana." (pp. 56-57.)

> ". . . [A]lthough a number of studies have been performed, at present no reliable evidence exists indicating that marijuana causes genetic defects in man." (p. 84.)

-34-

". . . [N]o objective evidence of specific
pathology of brain tissue has been documented.
This fact contrasts sharply with the well-
established brain damage of chronic alcoholism."
(p. 85.)

The Commission's finding concerning possible progression

to the use of hard drugs because of the use of marijuana

were as follows:

". . . [M]arijuana use per se does not
dictate whether other drugs will be used;
nor does it determine the rate of progression,
if and when it occurs, or which drug might
be used."  (pp. 88-89.)

". . . [T]he fact should be emphasized that
the overwhelming majority of users do not
progress to other drugs."  (p. 87.)

And concerning the danger to public safety because

of the use of marijuana, the Commission stated:

". . . [N]either the marijuana user nor the
drug itself can be said to constitute a
danger to public safety."  (p. 78.)

". . . [I]n sum, the weight of the evidence
is that marijuana does not cause violent
or aggressive behavior."  (p. 73.)

The general public policy considerations of using

the criminal law to the fullest extent in enforcing laws

against the possession of marijuana were stated as

follows:

"On the basis of this evaluation we believe
that the criminal law is too harsh a tool
to apply to personal possession even in the
effort to discourage use.  It implies an
overwhelming indictment of the behavior
which we believe is not appropriate.  The
actual and potential harm of use of the drug
is not great enough to justify intrusion
by the criminal law into private behavior, a
step our society takes only with the greatest
reluctance."  (p. 140.)

Indeed, the Commission concludes that use of the

criminal law arouses great suspicions about the integrity

of the criminal process:

". . [O]ther disturbing consequences
of laws proscribing possession for
personal use are the techniques required
to enforce them.  Possession of marijuana
is generally a private behavior; in order
to find it, the police many times must operate
on the edge of constitutional limitations.
Arrests without probable cause, illegal
searches and selective enforcement occur
often enough to arouse concern about the
integrity of the criminal process."  (At
page 145.)

Moreover, there are many other costs of enforcing the

marijuana possession laws which deplete the resources

of the state, such as clogged judicial calendars, social

costs of criminalizing large numbers of users, particularly

young people, and misallocation of enforcement resources.

(Id. at page 114.)

Indeed, the Commission concluded that this process

of enforcement of the criminal laws encourages disrespect

for the law, by the young and by the law enforcement

personnel who must enforce the laws:

"The final costs of the possession laws
is the disrespect which the laws and
their enforcement engender in the young.
Our youth cannot understand why society
chooses to criminalize their behavior with
so little visible ill-effect or adverse
social impact, particularly when so many
members of the law enforcement community
also question the same."  (Id. at page 145.)

Finally, the Commission found that the interests

of privacy played a large part in its final recommendations:

"[W]e are necessarily influenced by the
high place traditionally occupied by the
value of privacy in our constitutional
scheme.  Accordingly we believe that
government must show a compelling reason
to justify invasion of the home in order
to prevent personal use of marijuana.
We find little in marijuana's effects or
in its social impacts to support such a
determination.  Legislators enacting
prohibition did not find such a compelling
reason forty years ago; and we do not
find the situation any more compelling
for marijuana today.  (Id. at page 142.)
(Emphasis added.)

The problems inherent in prosecuting for possession

of marijuana were echoed by President Carter in a White

House statement he made on August 2, 1977:

> "Penalties against possession of a drug
> should not be more damaging to an
> individual than the use of the drug itself;
> and where they are, they should be changed.
> Nowhere is this more clear than in the
> laws against possession of marijuana in
> private for personal use.
>
> "There's not a federal prosecutor in the
> United States today who would prosecute
> a case of possession an ounce of marijuana
> or less."

The American Medical Association and the American Bar Association issued a rare joint press release on November 13, 1977, praising this statement made by President Carter:

> "We believe the time has come to liberalize
> laws regarding the possession of marijuana
> for personal use.  In too many states,
> statutes exact punishment that far exceeds
> the crime.
>
> "We agree with President Carter who showed
> a humane attitude in asking that the
> possession of insignificant amounts for
> personal use should not subject the user
> to criminal charges."

Indeed, a great many organizations have now called for the decriminalization of insignificant amounts of marijuana for personal use.  Those organizations include: National Council of Churches; National Commission on Marijuana and Drug Abuse (the Shafer Commission quoted at length herein); National Conference of Commissioners on Uniform State Laws; American Public Health Association; National Advisory Commission on Criminal Justice Standards and Goals; Consumers Union, publishers of Consumer Reports; National Education Association; Canadian Commission of Inquiry into the Non-Medical Use of Drugs (Le Dain Commission); John Finlator, retired Deputy Director, U.S. Bureau of Narcotics and Dangerous Drugs; Official State Study Commissions in the states of California, Illinois, Maine

-37-

Massachusetts, Michigan, New Jersey, Pennsylvania, Virginia and Wisconsin; Dr. Robert L. DuPont, Director, National Institute on Drug Abuse; National Association for Mental Health; American Academy of Pediatrics; and the American Academy of Family Physicians.

Apparently the increased public awareness and education on the marijuana issue has had its impact on the legislatures of some states. Beginning with Oregon in 1973, ten states have essentially stopped arresting marijuana users: Alaska: Alaska Stat. §17.12.100; California: Health and Safety Code, §11357 (West); Colorado: Colo. Rev. Stat. §12-22-413; Maine: Me. Rev. Stat. Title 22, §2383. Mississippi: Miss. Code Annot. §41-29-139; Minnesota: Minn. Stat. §152.15; New York: Penal Law §221.05 (McKinney); North Carolina: N.C. Gen. Stat. §90-113.14; Ohio: Rev. Code Annot. §2925.11 (Page); Oregon: Ore. Rev. Stat. §475.992.

I am fully aware that the legislature of this state is not compelled to follow the lead of these states in decriminalizing small amounts of marijuana. But the legislative actions of these states are at least an indication that they do not regard the possession of marijuana for personal, private use, to be such a great danger to public health and safety as to call for its eradication by the State with the entire arsenal of enforcement tools at its disposal. But regardless of what the legislature does, it is the duty of this Court, in the context of the home, to give full protection under the "right of privacy" provision of our Constitution, to adults who possess marijuana in the privacy of their homes for personal, private use. A failure to do so, based on the evidence that we now have to deal with, is a mockery of that very principle of "right of privacy".

-38-

The Alaska Supreme Court in Ravin, supra, and the
Michigan Supreme Court in People v. Sinclair (1972), 194
N.W.2d 878, have set forth the evidence in telling detail
concerning the use and effects of marijuana on its users.
Each of these courts has concluded that the effects of
alcohol are far more detrimental to their users, and the
toll on society is far greater than is the effects of
marijuana. We cannot ignore this evidence, and do so only
at the risk of alienating thousands and thousands of citizens
of this state who, but for their use of marijuana, are as
law abiding as the remaining citizens or residents of this
state.

In Sinclair, the Court concluded that "it cannot be
doubted that the judiciary has the power to determine the
true state of facts upon which a law is based." Sinclair,
194 N.W.2d at 881, citing Brown v. Board of Education (1954),
347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Accordingly,
the evidentiary basis for the enactment of legislation
could not be ignored. The question before the Court in
Sinclair was whether Sinclair had been denied equal pro-
tection of the law. But the Court in Ravin also concluded
it had a duty to review the evidentiary basis for the enact-
ment of the marijuana laws, even though the primary issue
was not equal protection of the law, but rather, the right
of privacy. The Court adopted a two-fold test. First, a
determination of whether or not a law or regulation has
violated in individual's right of privacy. Second, if the
right of privacy has been violated, "we will require that
the relationship between means and ends be not merely reason-
able but close and substantial." Ravin, 537 P.2d at 498.
As to the second test, it matters not that the test in the

-39-

context of the Montana Constitution and the facts of this case be a reasonable relationship between means and ends or the stronger requirement of a close and substantial relationship between means and ends. Clearly, the right of privacy under our Constitution would be violated here under either test. Nonetheless, I do not believe that this State can in good conscience adopt a less rigorous standard than that adopted in Ravin, for our Constitution specifically provides that the "right of privacy" can only be overcome by a "compelling state interest." (Art. II, §10, 1972 Mont. Const., supra.)

The Courts in Sinclair and Ravin, then set forth the salient and relevant evidence relating to the use of marijuana. I feel compelled to do the same, and shall do so by quoting extensively from the Sinclair and Ravin decisions.

In addition to extensive trial testimony from expert witnesses concerning the effects of using marijuana, the courts in Sinclair and Ravin relied on the available literature and national reports which studied at great length and in great depth, the many questions relating to marijuana use.

In Sinclair, the Court relied on the following books and reports: Interim Report of the Canadian Government Commission of Inquiry, The Non-Medical Use of Drugs (Penguin ed. 1970); President's Commission on Law Enforcement and Administration Of Justice, Task Force Report: Drunkenness (1967); L. Grinspoon, M.D. Marijuana Reconsidered (Bantam Book Ed. 1971); J. S. Kaplan: The New Prohibition (Pocket Book Ed. 1971); the court took judicial notice of the evidence introduced and the findings of fact made by the

-40-

trial court in the case of People v. Lorentzen (Mich. 1972), 194 N.W.2d 827; R. Bonnie & C. Whitebread II, The Forbidden Fruit And The Tree Of Knowledge: An Inquiry Into The Legal History of American Marijuana Prohibition, 56 Va.L.Rev. 971 (1970). In addition, the Court also relied on the facts found by the trial court in <u>Sinclair</u>, pursuant to a stipulation of factual accuracy entered into by counsel for defendant and counsel for the State of Michigan.

In <u>Ravin</u>, the Court listed the information it had examined:

> "Among the works we have examined in addition
> to the testimony below are the following:
> Marihuana: A Signal of Misunderstanding,
> the First Report of the National Commission
> on Marihuana and Drug Abuse (March 1972);
> Drug Use in America: Problem in Perspective,
> the Second Report of the National Commission
> on Marijuana and Drug Abuse (March 1973);
> Drug Use in Anchorage, Alaska, 223 J.Am.
> Med.Ass'n. 647 (1971); G. Nahas, Marihuaha:
> Deceptive Weed (1973); Nahas et al, Inhibition
> of Cellular Mediated Immunity in Marihuana
> Smokers, 183 Science 419 (1974); L. Grinspoon,
> Marihuana Reconsidered (1971); Hearings before
> the U.S. Senate Subcommittee on Internal
> Security, May 1974; Nahas & Greenwood, The
> First Report of the National Commission on
> Marihuana (1972): Signal of Misunderstanding
> or Exercise in Ambiguity, draft of article to
> be published in Bulletin of N. Y. Academy
> of Medicine; Marihuana and Health: Fourth
> Annual Report to the U.S. Congress from the
> Secretary of Health, Education, and Welfare
> (1974); Silverstein & Tessin, Normal Skin
> Test Responses in Chronic Marihuana Users,
> 186 Science 740 (1974); Marihuana: The Grass
> May No Longer Be Greener, 184 Science 683
> (1974); Marihuana (II): Does it Damage the
> Brain?, 185 Science 775 (1974); Depression
> of Plasma Testosterone Levels After Chronic
> Intensive Marihuana Use, 200 N.Engl.J.Med.
> 872 (1974): Plasma Testosterone Levels Before
> During and After Chronic Marihuana Smoking,
> 291 N.Engl.J.Med. 1051 (1974); Marijuana
> Survey-State of Oregon, Drug Abuse Council
> (1974)." <u>Ravin</u>, 537 P.2d at 504, n. 43.

<u>THE SOURCE OF AND CHEMICAL MAKE-UP OF MARIJUANA</u>:

In <u>Sinclair</u>, the Court stated:

-41-

"Despite our lack of complete knowledge though, we do have sufficient scientific knowledge to categorize drugs according to their relative level of danger to both the individual and society. Proceeding to a comparison of marijuana with other mind-altering drugs, we find marijuana is a euphoria producing mind altering drug, whose effects are generally obtained by smoking, but can also be obtained by oral injestion of the drug, usually mixed with food or drinks. Coming from the hemp plant, cannabis sativa, the psychoactive strength of the drug varies greatly with the part of the plant used, quality of the seed stock, and the growing conditions.

"The psychoactive ingredient of cannabis sativa has been isolated as two isomers of tetrahydrocannabinol (THC) although additional active ingredients of cannabis sativa may be discovered and isolated in the future. Thus the strength of any given amount of marijuana depends primarily on the amount of THC it contains. The ordinary street form of marijuana, commonly available and used in the United States, is composed of the leaves and flower clusters of the female plant, which are dried and crushed to make up the variable strength mixture. The resin from the flowering tops of the mature female plants is known as hashish (charas in India) and is currently the strongest form of the naturally occurring drug because it contains the highest concentration of THC. Hashish is as much as eight times as strong as ordinary marijuana."

"Consideration of the scientifically observed physical and psycho-motor effects of marijuana indicates that it is overall, the least dangerous mind-altering drug." Sinclair, 194 N.W.2d at 882. (Emphasis added.)

The chemical make-up of marijuana was also set forth in

Ravin, 537 P.2d at 505.

THE INCIDENCE OF USE OF MARIJUANA AND THE NUMBER OF ARRESTS:

In Ravin, the Court discussed the national statistics

as of 1973 for the number of Americans who had used

marijuana at least once:

"According to the figures published by the National Commission on Marijuana and Drug Abuse in 1973, an estimated 26 million Americans have used marijuana at least once. The incidence generally cuts across social and economic classes, though use is greatest among young persons (55% of 18-21 year-olds

-42-

have used it). Only about 2% of the adults who have used it were classified by the National Commission as 'heavy users' (more than once daily . . ." Ravin, 537 P.2d at 505.

As to the number of arrests for marijuana in recent years, the Ravin Court stated:

"The number of persons arrested for marijuana possession has climbed steeply in recent years. In 1973, over 400,000 marijuana arrests occurred, a 43% rise over the previous year. It should also be noted that 81% of persons arrested for marijuana related crimes have never been convicted of any crime in the past, and 91% have never been convicted of a drug related crime." Ravin, 537 P.2d at 508.

These statistics clearly demonstrate that marijuana users can hardly be classified as criminals by any stretch of the imagination. The unfairness of this situation is further illustrated by the fact that in this State alcoholism or drunkenness is now regarded as a disease and the direction to law enforcement officers who find people in a drunken condition is to treat them as needing medical help, not as needing incarceration in a jail. Section 80-2701 et seq. thru 80-2725, R.C.M. 1947, now section 53-24-101 through 53-24-108 MCA.

COMPARISON OF THE DANGERS OF USING MARIJUANA AS OPPOSED TO OPIATES OR ALCOHOL:

In Sinclair, the available scientific evidence led the Court to conclude that the use of alcohol is more dangerous than is the use of marijuana:

"Comparison of the effects of marijuana use on both the individual and society with the effects of other drug use demonstrates not only that there is no rational basis for classifying with the 'hard narcotics', but, also, that there is not even a rational basis for treating marijuana as a more dangerous drug than alcohol. This is not to say that our scientific knowledge concerning any of the mind-altering drugs is at all complete. It is not. Even our society's vast

experience with the mind-altering
effects of alcohol has not led to complete
scientific knowledge of that drug, as the
Canadian Government Commission of Inquiry
pointed out:

"'Little is known as to the specific
mechanism by which alcohol produces its
psycho-pharmacological action.  As with
most drugs, alcohol effects, especially
those resulting from low or moderate
amounts, depend to a large extent on the
individual and the situation in which the
drinking occurs.  A drink or two may produce
drowsiness and lethargy in some instances,
while the same quantity might lead to
increased activity and psychological
stimulation in another individual, or in
the same person in different circumstances.
Furthermore, a dose which is initially
stimulating may later produce sedation.'"
Sinclair, 194 N.W.2d at 883.  (Emphasis
added.)

In Sinclair, the Court set forth the role that

alcohol plays in producing acute physical and mental

problems, and even death, as well as leading to violent

criminal behavior:

"Both the opiates and alcohol provide a
dramatic contrast to the lack of physical
harmfulness of marijuana.  With the opiates,
high levels of tolerance develop, severe
physical addiction results from repeated use,
and deaths result from repeated use, and
deaths resulting from overdosage also occur.
Occasional social use of alcohol in moderate
dosage as a mind-altering drug has few
deleterious physical consequences.  However,
tolerance does develop in alcohol use and
the drug is subject to a great, acute and
chronic abuse.  Acute alcohol abuse can lead
to death from overdosage.  In addition,
chronic alcohol abuse leads to alcoholism where
a clear withdrawal syndrome is observable (an
easily discernible physical shaking and later
delirium tremens), and death of brain cells,
mental deterioration and cirrhosis of the
liver may occur.

"Damaging effects of alcohol on psychomotor
coordination are so well known as to need no
documentation.  The President's Commission
on Law Enforcement and Administration of
Justice, Task Force Report:  Drunkenness,
commenting on alcohol, observed that (p. 39):

"'There is probably no other area in the
field of drug research and related dangerous
behavior where the role of a drug as a

-44-

precipitating factor in dangerous behavior
is so clear.'" Sinclair, 194 N.W.2d at
883-884. (Emphasis added.)

The Court in Sinclair also took notice of a Special

Message to the Michigan Legislature in 1971, wherein

the Michigan Governor "recognized that the present classi-

fication of marijuana with the opiates is irrational"

but also "provided an illuminating comment on the relative

danger of alcohol." Sinclair, 194 N.W.2d at 886. The

pertinent parts of the Governor's message were quoted by

the Court:

> "'As public officials, we must face squarely
> the need for a major revision of our laws
> dealing with marijuana. The hypocrisy of
> our present law, which falsely classifies
> marijuana as a narcotic, affects the
> credibility of our entire drug abuse program.
> Recent federal legislation and the passage
> of local marijuana ordinances give new
> urgency in this controversial area. . .'
>
> "'Alcohol continues to be a larger problem
> than drugs. It accounts for more broken
> homes, wasted lives, accidental deaths,
> and greater expense for society than any
> drug. It is an established fact that
> alcohol can destroy brain tissue and cause
> cirrhosis of the liver which ultimately
> produces death. A significant portion of
> crime is committed by people under the
> influence of alcohol and alcohol-related
> problems are estimated to account for 15%
> to 25% of our welfare costs.'" Sinclair,
> 194 N.W.2d at 886. (Emphasis added.)

The Court in Ravin noted specifically that all

available evidence indicates that alcohol is a far more

dangerous drug than marijuana:

> ". . . The state is under no obligation
> to allow otherwise 'private' activity which
> will result in numbers of people becoming
> public charges or otherwise burdening the
> public welfare. But we do not find that
> such a situation exists today regarding
> marijuana. It appears that effects of
> marijuana on the individual are not serious
> enough to justify widespread concern, as
> least as compared with the far more dangerous
> effects of alcohol, barbiturates and
> amphetamines. Moreover, the current patterns
> of use in the United States are not such as

-45-

would warrant concern that in the future consumption patterns are likely to change." Ravin, 537 P.2d at 509-510.

## THE USE OF MARIJUANA DOES NOT LEAD ONE TO COMMIT CRIMES OF VIOLENCE, IN STARK CONTRAST TO THE KNOWN PROPENSITIES OF ALCOHOL:

It is a common understanding that marijuana has a direct connection to the propensity of users to commit crimes of violence. In Sinclair and in Ravin the courts concluded that evidence did not support this assumption, but noted further that there is a direct relationship between the use of alcohol and the commission of crimes of violence: In Sinclair the Court stated:

> "There is no reliable scientific evidence demonstrating that chronic psychosis can be caused by marijuana use in dramatic contrast to the American experience with alcohol. The argument that marijuana use causes or contributes to assaultive crime is now largely discredited. Again, by contrast, considerable evidence points to a substantial connection between alcohol use and commission of violent crimes." Sinclair, 194 N.W.2d at 885.

And, quoting from the President's Task Force Report:

> "President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Drunkenness (1967), p. 41: 'On the basis of the present data one can say that there is a strong link between alcohol and homicide and that the presumption is that alcohol plays a causal role as one of the necessary and precipitating elements of violence.'" Sinclair, 194 N.W.2d at 885, n. 31.

In Ravin, the Court summarized the available evidence as follows:

> "The experts generally agree that the early widely-held belief that marijuana use directly causes criminal behavior, and particularly violent, aggressive behavior, has no validity. On the contrary, the National Commission found indications that marijuana inhibits 'the expression of aggressive impulses by pacifying the user, interfering with muscle coordination, reducing psychomotor activities and generally producing states of drowsiness, lethargy, timidity and passivity.'" Ravin, 537 P.2d at 507, (quoting Marijuana: A Signal of Mis-understanding, The First Report of the National Commission on Marijuana and Drug Abuse (March 1972), 70-71.)

-46-

## THE RELATIONSHIP BETWEEN USE OF MARIJUANA AND PROGRESSION TO USE OF HARD DRUGS:

It is also a common misunderstanding that marijuana use leads one down the path to the use of hard drugs. In <u>Sinclair</u> and <u>Ravin</u>, the Courts discussed and disposed of this misconception. In <u>Sinclair</u>, the Court stated:

> "Finally, the 'stepping stone argument' that marijuana use leads to use of 'hard narcotics' has no scientific basis. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Narcotics and Drug Abuse, found at pp. 13-14:

> "'The charge that marijuana "leads" to the use of addicting drugs needs to be critically examined. There is evidence that a majority of the heroin users who come to the attention of public authorities have, in fact, had some prior experience with marihuana. But this does not mean that one leads to the other in the sense that marijuana has an intrinsic quality that creates a heroin liability. There are too many marihuana users who do not graduate to heroin, and too many heroin addicts with no known prior marihuana use, to support such a theory. <u>Moreover there is no scientific basis for such a theory.</u> The basic text on pharmacology, Goodman and Gilman, <u>The Pharmacological Basis of Therapeutics</u> (Macmillan 1960) states quite explicitly that marihuana habituation does not lead to the use of heroin.'" <u>Sinclair</u>, 194 N.W.2d at 885. (Emphasis in original.)

In <u>Ravin</u>, the Court stated:

> ". . . Moreover, <u>the Commission and most other authorities agree that there is little validity to the theory that marijuana use leads to use of more potent and dangerous drugs.</u> Although it has been stated that the more heavily a user smokes marijuana, the greater the probability that he has used or will use other drugs, 'it has been suggested that such use is related to "drug use proneness" and involvement in drug subcultures rather than to the characteristics of cannabis, per se.'" <u>Ravin</u>, 537 P.2d at 507. (Emphasis added.)

## THE NEED FOR MEDICAL ATTENTION AS A RESULT OF THE USE OF MARIJUANA:

In <u>Sinclair</u>, the Court accepted the following findings of fact as adopted by the trial court, and which the State

of Michigan accepted as true:

> "'From the general public standpoint, the
> general marijuana user would require no
> treatment at all.  Most marijuana users do
> not have problems that would require any
> treatment from a medical or psychiatric
> point of view.  Those that seek help because
> they have an adverse reaction to marijuana
> or because they think they are using too much
> of the drug ordinarily need some guidance and
> some support and not much else.  The majority
> of current marijuana users are using but not
> abusing the drug in the sense that one would
> normally think of dangerous drug abuse.  To
> say that marijuana is an absolutely harmless
> drug is untrue, on the other hand, to say that
> it is a horrendous drug is equally untrue.
> Marijuana is a drug with potential dangers for
> some people when taken in conventional doses.
> Marijuana is safe for most people in conventional
> doses.  Occasional, recreational use of marijuana
> for most individuals will be a pleasurable
> experience, involving no adverse reactions.
> The vast majority of recreational marijuana
> users will emerge from their drug experience
> without any apparent harm, either to themselves
> or to society.'"  Sinclair, 194 N.W.2d 886-887,
> n. 35.  (Emphasis added.)

THE PHYSIOLOGICAL AND PSYCHOLOGICAL EFFECTS OF USING
MARIJUANA:

Both the Sinclair and Ravin decisions discussed in

detail the physiological and psychological effects of

using marijuana.  The general physiological effects induced

by using marijuana were described in Sinclair as follows:

> "Consideration of the scientifically observed
> physical and psycho-motor effects of marijuana
> indicates that it is overall, the least
> dangerous mind-altering drug.  Observed
> physical effects of marijuana use include
> dryness of mouth and throat, slight increase
> in pulse rate, and slight conjunctival
> reddening of the eyeball.  No known tolerance
> develops to marijuana--in fact negative
> tolerance has been observed, that is, a decreased
> amount of the drug taken on subsequent occasions
> produces the same level of physical and euphoric
> effect.  No physical dependency is produced by
> use of the drug and, hence, there are no with-
> drawal symptoms or 'abstinence syndrome' when
> the drug is unavailable to the user."

"No lethal dose for marijuana has been
established.  The lack of harmful physical
effects from marijuana has been well summarized
by Dr. Grinspoon in Marijuana Reconsidered
(Bantam ed., 1971), p. 60:

"'What is so striking about the pharmacology
of cannabis is that it has such limited
and mild effects on human nonpsychic function.
This is consistent with the equally striking
observation that there has never in its long
history been reported an adequately documented
case of lethal overdosage.  Nor is there any
evidence of cellular damage to any organ.'"
Sinclair, 194 N.W.2d at 882-883.

And, based on the available scientific evidence, the

Court in Ravin discussed the short term and long term

physiological effects of marijuana use:

"The short-term physiological effects are
relatively undisputed.  An immediate slight
increase in the pulse, decrease in saliva-
tion, and a slight reddening of the eyes
are usually noted.  There is also impairment
of psychomotor control.  These effects
generally end within two to three hours of
the end of smoking.

"Long-term physiological effects raise more
controversy among the experts.  The National
Commission on Marihuana and Drug Abuse reported
that among users 'no significant physical,
biochemical, or mental abnormalities could
be attributed solely to their marijuana smoking.'
Certain researchers have pointed to possible
deleterious effects on the body's immune
defenses, on the chromosomal structures of
users, and on testosterone levels in the body.
The methodology of certain of these studies
has been extensively criticized by other
qualified medical scientists, however.  These
studies cannot be ignored.  It should be noted
that most of the damage suggested by these
studies comes in the context of intensive
use of concentrated forms of THC.  It appears
that the use of marijuana, as it is presently
used in the United States today, does not
constitute a public health problem of any
significant dimensions.  It is, for instance,
far more innocuous in terms of physiological
and social damage than alcohol or tobacco.
But the studies suggesting dangers in intensive
cannabis use do raise valid doubts which
cannot be dismissed or discounted.  Ravin,
537 P.2d at 506.  (Emphasis added.)

In Sinclair, the Court relied extensively on the

Canadian Commission Report concerning the psychological

effects of using marijuana.  The Court stated:

-49-

"Marijuana is a mild hallucinogen, which
in view of its lack of any other harmful
effects, leads us to conclude that there
is no rational basis for penalizing it more
severely than the other hallucinogens.
(Citation omitted.)  Indeed, mild hallucinogenic
effects are reported almost exclusively from use
of more potent hashish type preparations and
rarely, if ever, from the use of ordinary street
variety marijuana.  The Canadian Commission
Report states (pp. 116-117):

"'Cannabis is one of the least potent of the
psychedelic drugs, and some might object
to its being classified with LSD and similar
substances.  It is often suggested that
marijuana is a mild intoxicant, more like
alcohol. . .  It would be incorrect to say
that cannabis in moderate dose actually
produces a mild LSD experience; the effects
of these two drugs are psychiologically,
behaviorally and subjectively quite distinct.
Furthermore, since no cross-tolerance occurs
between LSD and THC the mechanism of action
of these two drugs is thought to be different.'

"The Canadian Commission Report comprehensively
summarized the various possible psychological
effect of marijuana use as follows (pp. 117-118):

"'A cannabis "high" typically involves several
phases.  The initial effects are often somewhat
stimulating and, in some individuals, may elicit
mild tension or anxiety which usually is replaced
by a pleasant feeling of well-being.  The later
effects usually tend to make the user intro-
spective and tranquil.  Rapid mood changes often
occur.  A period of enormous hilarity may be
followed by a contemplative silence.'

"'Psychological effects which are typically
reported by users include:  happiness, increased
conviviality, a feeling of enhanced interpersonal
rapport and communication, heightened sensitivity
to humor, free play of the imagination, unusual
cognitive and ideational associations, a sense
of extra-ordinary reality, a tendency to notice
aspects of the environment of which one is
normally unaware, enhanced visual imagery, an
altered sense of time in which minutes seem like
hours, changes in visually perceived spatial
relations, enrichment of sensory experiences
(subjective aspects of sound and taste perception
are often particularly enhanced), increased
personal understanding and religious insight,
mild excitement and energy (or just the opposite),
increased or decreased behavioral activity,
increased or decreased verbal fluency and talkative-
ness, lessening of inhibitions, and at higher
doses, a tendency to lose or digress from one's
train of thought.  Feelings of enhanced spontaneity

-50-

and creativity are often described, although an actual increase in creativity is difficult to establish scientifically. While most experts agree that cannabis has little specific aphrodisiac (sex stimulating) effect, many users report increased enjoyment of sex and other intimate human contact while under the influence of the drug.

"Less pleasant experiences may occur in different individuals, or possibly in the same individuals at different times. Some of these reactions may include: fear and anxiety, depression, irritability, nausea, headache, backache, dizziness, a dulling of attention, confusion, lethargy, and a sensation of heaviness, weakness and drowsiness. Disorientation, delusions, suspiciousness and paranoia, and in some cases, panic, loss of control, and acute psychotic states have been reported." Sinclair, 194 N.W.2d 884-885.

The psychological effects of using marijuana were

set forth in the Ravin decision as follows:

"The immediate psychological effects of marijuana are typically a mild euphoria and a relaxed feeling of well-being. The user may feel a heightened sensitivity to taste and to visual and aural sensations, and his perception of time intervals may be distorted. A desire to become high can lead to a greater high; fear of becoming high or general nervousness can cause the user to fail to experience any high at all. In rare cases, excessive nervousness or fear of the drug can even precipitate a panic reaction. Occasionally a user will experience a negative reaction such as anxiety or depression, particularly when he takes in more of the substance than needed to achieve the desired high. However, in smoking marijuana, the usual method of taking it in this country, the user can self-titrate, or control the amount taken in, since the effect builds up gradually.

"Additionally short-term effects are an impairment of immediate-past-memory facility and impairment in performing psychomotor tasks. Experienced users seem less impaired in this regard than naive users.

"In extremely rare instances, use of marijuana has been known to precipitate psychotic episodes; however, the consensus of the experts seems to be that the potential for precipitating psychotic episodes exists only for a limited number of prepsychotic persons who could be pushed into psychosis by any number of drug or nondrug-related influences.

-51-

"There is considerable debate as to the
long-term effects of marijuana on mental
functioning. Certain researchers cite
evidence of an 'amotivational syndrome'
among long-term heavy cannabis users.
However, the main examples of this effect
are users in societies where large segments
of the population exhibit such traits as
social withdrawal and passivity even without
drug use. The National Commission concludes
that long-time heavy users do not deviate
significantly from their social peers in
terms of mental functioning, at least to any
extent attributable to marijuana use." Ravin,
537 P.2d at 506-507.

Moveover, as previously indicated, the Court in

Sinclair noted that chronic psychosis rarely if ever

results from the gross abuse of marijuana, but chronic

psychosis is frequently the result of chronic abuse of

alcohol. Sinclair, 194 N.W.2d at 885.

It is patently clear that the Courts in Sinclair

and in Ravin did not reach their conclusions without a

detailed and careful consideration of the available

scientific evidence. In each case the Court was presented

with a different primary legal issue, but also in each

case the Court assessed the facts before its determination.

The obligations of this Court are no less. Indeed, in

light of the "right of privacy provision in our State

Constitution, the duty here was even stronger.

Perhaps in enacting legislation, the legislature has

the right to ignore the facts; but this Court has no

right to ignore the facts in applying the Constitution

of this State. It is our duty to marshall and assess the

facts, and even more so if the legislature fails or refuses

to do so.

Based on the available evidence of lack of public harm by the use of marijuana (and indeed, the relative harmlessness of marijuana use when compared to the use of alcohol, and perhaps even tobacco), it is little wonder that the national organizations which I previously listed, and the states which I previously listed, have concluded that the possession of small quantities of marijuana should be decriminalized. But regardless of the position that the legislature in this State takes, this Court cannot ignore this lack of public harm in determining whether law enforcement officers should be allowed to invade the privacy of the home to obtain evidence of possession or use of marijuana used only in the privacy of that home and only for personal, private purposes. Clearly, this Court must recognize a distinction between public conduct which the State can legitimately regulate, and private conduct, in which the State has no legitimate interest because of the nature of the activity involved and a lack of public harm. We must also distinguish between the right of the State to regulate economic and social relationships from an attempt by the State to regulate the purely private conduct of its citizens which causes no public harm.

These distinctions were ably expressed by Justice Levinson in his dissenting opinion in State v. Kantner (Hawaii 1972), 493 P.2d 306, where he concluded that there was no evidentiary basis for the criminalization of small quantities of marijuana intended for purely personal, private use:

> "I wish to make it clear that the views
> expressed in this opinion apply only to
> private conduct of individuals. The vice
> of the present statute springs from the
> license it gives to the State to violate

a person's reasonable expectation of privacy. Where conduct is public in nature, however, society has a greater claim to the right of control and the State need not show as compelling an interest in its prohibition. Moreover, this analysis is not meant to imply a right to the personal use of other prohibited drugs, such as heroin and other narcotics, which are not involved in this case.

"Finally, it should be stressed that the analysis I have adopted does not seek to establish this court as a super-legislature, exercising veto power over the wisdom and value of legislative policies. See Griswold v. Connecticut, supra at 512, 85 S.Ct. 1678 (Justice Black's dissenting opinion). Any criticism which attempts to deter courts from inquiring into the constitutionality of laws must distinguish between legislation which seeks to regulate economic and social relationships and that which intrudes into the purely private sphere of human life. In the former instance courts right fully grant the legislature wide latitude for experimentation in the promotion of the public good. But, where the State endeavors to intrude into the individual's private life and regulate conduct having no public significance, it is the duty of the courts to offer a haven of refuge where the individual may secure vindication of his right to be left alone." Kantner, 493 P.2d at 317-18. (Emphasis added.) (Levinson, J., dissenting.)

It is also significant that in Sinclair, in a separate opinion, Justice Kavanaugh concluded that the legislature had no right to criminalize possession and private use of marijuana, and in doing so was acting as a "Big Brother" by injecting itself into a place where it had no right to be:

"I find that our statute violates the Federal and State Constitutions in that it is an impermissible intrusion on the fundamental rights to liberty and the pursuit of happiness, and is an unwarranted interference with the right to possess and use private property.

"As I understand our constitutional concept of government, an individual is free to do whatever he pleases, so long as he does not interfere with the rights of his neighbor or of society, and no government--State or Federal--has been ceded the authority to interfere with that freedom. As has been said:

-54-

"'. . . the sole end for which mankind
are warranted, individually or collectively,
in interfering with the liberty of action
of any of these number, is self-protection.
That the only purpose for which power can
be fully exercised over any member of a
civilized community, against his will, is
to prevent harm to others. His own good,
either physical or moral is not a sufficient
warrant. J.S. Mill, On Liberty, Chapter 1.'

"Whatever the validity of the concept that
traffic in marijuana is freighted with a
proper public interest, it is extending the
concept entirely too far to sanction
proscription of possession and private use
of it. Although it is conceivable that some
legitimate public interest might warrant state
interference with what an individual consumes,
'Big Brother' cannot, in the name of Public
health, dictate to anyone what he can eat or
drink or smoke in the privacy of his own home.

"In my view when the legislature proscribed
the possession and private use of marijuana
as a Public health measure it did so uncon-
stitutionally." Sinclair, 194 N.W.2d at
896. (Emphasis added.)

Courts should, when asked to determine a right of

privacy claim in light of a countervailing claim of the

State's right to regulate the conduct of individuals,

adopt a standard by which the competing interests should

be weighed. Justice Levinson, in Kantner, suggested the

test should be that set forth in the concurring opinion

of Justice Goldberg in Griswold v. Connecticut (1965),

381 U.S. 479, 497, 85 S.Ct. 1678, 1688, 14 L.Ed.2d 510:

"'In a long series of cases this Court has
held that where fundamental personal liberties
are involved, they may not be abridged by the
States simply on a showing that a regulatory
statute has some rational relationship to
the effectuation of a proper state purpose.
'Where there is a significant encroachment
upon personal liberty, the State may prevail
only upon showing a subordinating interest
which is compelling,' Bates v. Little Rock
361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d
480. The law must be shown 'necessary, and
not merely rationally related, to the accomplish-
ment of a permissible state policy.' McLaughlin
v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290,
13 L.Ed.2d 222. See Schneider v. State,
Irvington, 308 U.S. 147, 161 60 S.Ct. 146, 151,
84 L.Ed. 155'" Kantner, 493 P.2d at 317. (Levinson,
J., dissenting.)

Justice Levinson, in his dissent, reviewed the available evidence as against the State's claim of marijuana's harmfulness, and concluded that the State's attempted justifications for criminalizing the private use and possession of marijuana were unsubstantiated. The State could not prove the social (public) injury to justify the intrusion into a person's privacy. He stated:

> ". . . In short, marijuana produces experiences affecting the thoughts, emotions and sensations of the user. These experiences being mental in nature are thus among the most personal and private experiences possible. For this reason I believe that the right to be let alone protects the individual in private conduct which is designed to affect those areas of his personality, so long as such conduct does not produce detrimental results.
>
> "This principle that the State's power to restrain private conduct is limited by the need to show social injury was recognized by this court in State v. Lee, 51 Hawaii 516, 521, 465 P.2d 573, 577 (1970):
>
> "'(W)here an individual's conduct, or a class of individuals' conduct, does not directly harm others the public interest is not affected and is not properly the subject of the police power of the legislature.'
>
> "In the Lee case, the court went on to announce a narrow exception to the above general rule. The State may also act to protect a large class of individuals from harm to themselves, but only where such harm has been compellingly demonstrated to the satisfaction of the court. State v. Lee, supra. Because the State has failed to establish that the private, personal use of marijuana harms either the user or society, I would hold that the prohibition of HRS 329-5 (Supp. 1971) unreasonably infringes upon the appellants' rights to personal automony." Kantner, 493 P.2d at 315. (Emphasis added.) (Levinson, J., dissenting.)

In the present case, the State has not proved and, of course, the evidence does not justify the conclusion that there is a compelling State interest to invade the privacy of one's home to obtain evidence of possession and use of marijuana for personal, private use. This does not mean however, that the distribution, sale, possession

and use of marijuana should not be controlled by the

State. But it is vitally important that the method adopted

not be oppressive and counter to the constitutional rights

of those regulated. In Goldblatt v. Town of Hempstead

(1962), 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130, the

United States Supreme Court reiterated the basic test for

the valid exercise of the police power:

> ". . . The term 'police power' connotes the
> time-tested conceptional limit of public
> encroachment upon private interests. Except
> for the substitution of the familiar standard
> of 'reasonableness,' this Court has generally
> refrained from announcing any specific criteria.
> The classic statement of the rule in Lawton v.
> Steele, 152 U.S. 133, 137, [38 L.Ed. 385, 388,
> 14 S.Ct. 490 (1894)], is still valid today:
>
> "'To justify the State in . . . interposing
> its authority in behalf of the public, it
> must appear, first, that the interests of
> the public . . . require such interference;
> and, second, that the means are reasonably
> necessary for the accomplishment of the
> purpose, and not unduly oppressive upon
> individuals.'" Goldblatt, 369 U.S. at 594-
> 95, 82 S.Ct. at 990, 8 L.Ed.2d at 134. (Emphasis
> added.)

I can think of no law that is more oppressive to

a significant percentage of the citizens of this State

than one which singles them out and subjects them to

searches and seizures in the home, where the conduct

proscribed has not been shown to be injurious to the public,

or, for that matter, injurious to the individual when

compared to alcohol or tobacco. It cannot be a compelling

State interest for the State to attempt to protect an

individual from his own folly by subjecting him to invasions

of his privacy and criminal sanctions, simply because he

has chosen to possess or use marijuana in the privacy of

his home.

One type of State regulation which would not involve

the invasion of one's privacy in his home, was suggested by

-57-

Justice Kobayashi in _Kantner_, where, in his dissent he concluded that marijuana possession in the privacy of one's home should not be criminalized, but that marijuana should be regulated in the same manner as alcohol and tobacco are regulated:

> "Just as it is a valid exercise of the State of Hawaii's police-power to regulate the sale, use, and possession of such commodities as alcohol and tobacco, it is axiomatic that the regulation of marijuana is also a valid state activity. . ." Kantner, 493 P.2d at 318. (Kobayashi, J., dissenting.)

His reasons for suggesting this approach were stated as follows:

> "It is evident that much research into the long term effects of consuming marijuana is presently needed. As yet, however, it has not been shown that consumption of marijuana is any more harmful than a comparable consumption of alcohol and it is doubtful that the presently known effects of marijuana are as adverse as those of alcohol. Until legitimate research indicates otherwise, the harm created by placing a criminal sanction of the activity of a significant percentage of our population who would otherwise be law abiding citizens far outweighs any present benefit to be derived from the effects of classifying marijuana as a narcotic. There is no logical or otherwise rational reason for our society, on the basis of a law that has little or no merit in its application to continue to make criminals out of and consequently alienate the youth of today.

> "The use of marijuana does not cause the social evils that the legislature has attempted to guard against . . .

> "It is suggested that a more reasonable and rational approach in this area would be to regulate marijuana in a manner similar to that of alcohol or tobacco. In this way, the abusive effects of marijuana, not its reasonable use, would be given criminal sanctions. Such a change of the law would instill the respect of society that is needed for the preservation of criminal justice and prospectively decrease the criminalization of our younger generation." Kantner, 493 P.2d at 320. (Kobayashi, J., dissenting.)

Implicit in this approach is a belief that the distribution, sale, possession and use of marijuana should be legalized. Though I take no position on this suggestion, I agree with the underlying theme that the present method of using criminal sanctions to combat the possession of marijuana in the privacy of one's home, does significantly more harm than good and leads to a general disrespect for our laws.

It must also be emphasized that although the Court in Ravin confined the right to possess marijuana to the privacy of the home, two concurring opinions clearly indicated that the Court may well be called upon to determine whether such right also existed outside the home.

In a concurring opinion by Justice Boochever (and concurred in by Justice Connor), he carefully analyzed the United States Supreme Court decisions involving the right of privacy, and concluded that although his home was the primary situs in which the right was exercised, it was not the only place for the right of privacy fundamentally belongs to each individual, and does not relate to any situs. He especially emphasized in this regard, the right, and the duty of the Alaska Supreme Court in effectuating its own privacy provision in its constitution, to go beyond those decisions of the United States Supreme Court:

> ". . . While Federal cases defining the
> right of privacy derived from other
> provisions of the United States Constitution
> are of assistance in determining the perimeters
> or our constitutional right to privacy, we
> are certainly not beyond by those cases in
> construing the separate Alaska provision.
> Even when Alaska Constitutions provisions are
> closely akin to those of the Federal Constitution,
> we have stated:

-59-

"'While we must enforce the minimum constitutional standards imposed upon us by the United States Supreme Court's interpretation of the Fourteenth Amendment, we are free, and we are under a duty, to develop additional constitutional rights and privileges under our Alaska Constitution if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by idly and passively, waiting for constitutional direction from the highest court of the land. Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law.'" Ravin, 537 P.2d at 513. (Citing Baker v. City of Fairbanks (Alaska 1970), 471 P.2d 396, 401-402.)

Justice Connor, in a separate concurring opinion, also pointed out the nature of the problems that will undoubtedly arise concerning the invocation of the right of privacy and the appropriate test to apply:

"The decision today properly leaves unanswered the question of how far the right to privacy, in connection with the possession of marijuana, extends outside the home. Such a determination can be made only when we are presented with specific facts against which the individual's claim of privacy can be measured, as opposed to the state's assertion of power to control the possession of marijuana. Under the test we have employed in determining the scope of the right to privacy, it is necessary to balance these conflicting claims and determine, whether the state's prohibition bears a direct and substantial relationship to effectuating a legitimate state interest.

". . .

"It is certain that the right to privacy does not vanish when one leaves the home. There are certain aspects of personal autonomy which one carries with him even when he ventures out of the home, though the claim to privacy diminishes in proportion to the extent that one's person and one's activities impinge upon other persons. But, in order to trace the contours of the right to privacy, it will be necessary to engage in a critical analysis of the facts of each case which presents itself for decision. Only in this fashion can the right to privacy, outside the home, be

-60-

be determined on a reasoned, coherent
basis so as to furnish the courts and
the public with reliable rules of action.
Much definitional work, therefore, remains
to be done in the cases yet to be determined."
Ravin, 537 P.2d at 516.

Concerning the analysis and observations of Justices Boochever and Connor, less cannot be said concerning our duty to interpret out own constitution.

As discussed earlier in this opinion, I am sure there is nearly universal agreement that the right of privacy exists in the home if it exists anywhere. The difficult question is in deciding what kind of activity should be protected in the home from the intrusions of the State. Agreement, on this subject seems to depend directly on whose ox is being gored. Too often we want protection for what "we" do in the privacy of "our" homes but not for what "they" do in the privacy of "their" homes. Under our constitution however, it is the function of this Court to permit all conduct in the privacy of the home as long as a countervailing compelling State interest does not take a higher precedence.

Based on the available evidence as to the lack of public harm (and, indeed, even the relative lack of harm to the individual when compared to the use of alcohol and perhaps also tobacco), I find no difficulty in determining that a compelling State interest did not exist for the police to seize the marijuana plants in the defendant's home.

I would accordingly, order that the marijuana plants seized in the defendant's home, be suppressed, and order that the cause be dismissed.

Daniel J. Shea

Justice

-61-